IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**CYNTHIA VÉLEZ**,

    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

Civil No. 19-1007 (BJM)

**OPINION AND ORDER**

    Cynthia Vélez ("Vélez") seeks review of the Commissioner's finding that she is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Vélez contends the Commissioner's decision should be reversed because the administrative law judge ("ALJ") erred in holding the hearing by video teleconference ("VTC") after she filed her objection to it, and that the ALJ's residual functional capacity ("RFC")[1] finding and step five non-disability determination were not supported by substantial evidence, particularly because of the weights afforded to the medical opinions and because the ALJ as a lay person made a medical conclusion about disability. Docket Nos. 1, 9, 19, 21. The Commissioner opposed. Docket No. 13. This case is before me on consent of the parties. Docket No. 12, 22. After careful review of the administrative record and the briefs on file, and for the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

**STANDARD OF REVIEW**

    After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.

---

[1] An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1).

§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982).  In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity."  If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1.  If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled.  If not, the ALJ assesses the claimant's RFC and determines at step four whether the impairments prevent the claimant from doing the work she has

performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If she cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of her RFC, as well as her age, education, and work experience. If the claimant cannot, then she is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving that she cannot return to her former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy that the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that her disability existed prior to the expiration of his insured status, or her date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript.

Vélez was born on August 18, 1975, completed high school, does not understand the English language (communicates in the Spanish language), and worked as a heavy equipment operator. On February 22, 2013, Vélez applied for disability insurance benefits, claiming to have been disabled since June 19, 2013[2] (onset date) at age 37[3] due to back pain, herniated discs, pinched nerves, muscle spasms, arthritis, and a nervous condition. She last met the insured status requirements on December 31, 2015. Social Security Transcript ("Tr.") 28-29, 411, 415, 418-421.

***Treating physicians***

*Physical conditions:*

**State Insurance Fund ("SIF")**

---

[2] Vélez originally claimed that her onset date was December 15, 2010 (Tr. 405), but in 2016 amended it to June 19, 2013 "[a]fter considering all the evidence in file." Tr. 415.

[3] Vélez was considered to be a younger individual (Tr. 28), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

Vélez was treated under the auspices of the SIF in 2006-2007. Most notes are illegible. Exh. 32F at Tr. 208-243, 646-681. Notes from May and June 2006 show that she fell down a flight of stairs, sprained her right ankle, and hurt her knee when she hit the ground. She was walking with difficulty, and her pain was moderate. Vélez was referred to physical therapy. Tr. 213, 217-218, 221, 240-243, 651, 655-656, 659, 678-681. There is a note at Tr. 680 that Vélez had a history of migraines.

Physical therapy notes from October 2006 show that she felt chronic intermittent pain, which interfered with her ability to sit, stand, and walk. Tr. 219, 657. January 2007 notes show that she still felt chronic, but now occasional, pain. She was observed walking without difficulty, with a normal walking pattern. Her sensation was not affected, her muscular tone was normal, and there were no deformities. Her coordination, proprioception, posture, and long inferior extremities were normal. Her postural responses were good. Tr. 215, 230-231, 653, 668-669.

Vélez was discharged from the SIF on February 2007 with no disability benefit. Exh. 18F at Tr. 540.

**Primary Medical Group**

The record contains mostly illegible handwritten monthly progress notes dated April 2012 to March 2013 from the Primary Medical Group. These notes show that Vélez had a history of migraine and depression, and had knee discomfort, upper and low back pain, and nasal congestion. She was prescribed medications. Exh. 1F at Tr. 483-490.

In June 2016, Vélez was administered by injection Toradol and Norflex. June 2016 X-rays of the cervical spine showed minimal anterior spondylosis of C5 vertebra, and reversed lordosis of the cervical spine, likely related to a muscle spasm. The thoracic spine X-rays showed no radiographic signs of bone or joint abnormality. August 2016 X-rays of the lumbosacral spine showed that Vélez had mild degenerative disc disease at the L5-S1 level, straightening of the lumbar spine related to muscle spasm, and status post cholecystectomy. Right foot X-rays showed mild arthrosis, but no destructive bone lesion or fracture. Exh. 33F at Tr. 244, 682-685; Exh. 35F at Tr. 699.

**Dr. Derick Colón**

Handwritten notes between August 2012 to March 2013 by physiatrist and rehabilitation specialist Dr. Colón are illegible, but show that Vélez was prescribed medications for back pain, and was diagnosed with radiculopathy. A March 2013 MRI of the lumbosacral spine showed a

mild posterior bulging disc at L4-L5; a slightly indenting the thecal sac; degenerative disc disease and degenerative changes in the vertebral endplates at L5-S1; and loss of the normal lumbar lordosis, likely secondary to a muscle spasm. An August 2013 electrodiagnostic evaluation showed bilateral L5 chronic nerve root irritation. There is evidence from March 2014 that Vélez was administered a lumbar epidural block. Exh. 2F at Tr. 492, 494; Exh. 19F at Tr. 541-552.

**Dr. Luis Cummings**

January and March 2014 health insurance referral documents to anesthesiologist and pain management specialist Dr. Cummings show a diagnosis of radiculopathy and bulging discs at L4-L5, and a prescription for Norflex and a lumbar epidural block. Exh. 13F at Tr. 530-533. There are progress notes from January and March 2014, which are mostly illegible, that show that Vélez had a history of migraines, obesity, gastroesophageal reflux disease, osteoporosis, and depression. Exh. 35F at Tr. 698, 706. Her lower back pain was a seven out of ten. Exh. 35F at Tr. 701-702. She was administered a nerve block (Depo-Medrol) on March 5, 2014. Tr. 705. There is a list of eleven medications she was taking, including for pain and to alleviate her muscle spasms (Flexeril, Tramadol, Neurontin) as well as medications for an emotional condition. Tr. 703, 707-708. In March 2014, Dr. Cummings indicated that Vélez improved 50% according to the analog visual scale, with a decrease in neurological deficit. Exh. 13F at Tr. 527.

There is evidence that Vélez was evaluated in June 2016 for physical therapy, but the evaluation is illegible. Exh. 30F at Tr. 643, Exh. 35F at Tr. 700.

**Dr. Osvaldo J. Santiago**

Vélez was referred to Dr. Santiago, vascular surgeon, for complaints of varicose veins with pain and swelling on both legs, and symptoms associated with standing. Vélez claimed that her thigh pain was an eight out of ten. The record contains progress notes from September 2014 to July 2016 that reveal that Vélez consistently complained of swelling in her ankles and feet, and pain in her legs. The different studies conducted show that while she had bilateral superficial varicose veins with pain and lymphedema, there was no evidence of deep or superficial vein thrombosis bilaterally, or abnormalities in lymphatic drainage from both lower extremities. Vélez ambulated freely, despite her obesity and condition of her lower extremities. She was prescribed medications (Vasoflex and Lozol). There was no objective sign of limited functionality and she remained stable with treatment. Tr. 17-20, Exh. 28F at Tr. 619-640, Exh. 23F at 14.

**Dr. Gilberto Alvarado**

The record contains treatment notes with a sports medicine orthopedic surgery sub-specialist, Dr. Alvarado. The four progress notes between May 2014 and November 2015 are illegible. Exh. 20F at Tr. 553-556; Exh. 27F at Tr. 200-203, 615-618.

**Hospital San Lucas**

In 2015, Vélez continued with physical therapy, but notes are illegible. Exh. 22F at Tr. 163-173, 564-575.

**Centro de Salud de Adjuntas**

Vélez visited an emergency room on July 19, 2016 for migraine headache, and was prescribed medications. Tr. Exh. 29F at Tr. 204-205, 641-642.

*Mental conditions:*

**Dr. Américo Oms**

Progress notes from May 2013 through January 2014 show that Vélez was alert and oriented. Her mood was depressed and her affect was restrained. Her speech was slow. She had poor impulse control, judgment, and insight. She had no suicidal or homicidal thoughts. Exh. 11F at Tr. 124-130, 517-523. The record also contains a medical report dated August 1, 2013 by psychiatrist Dr. Oms. I find this portion of the record illegible, so I extracted the following information from the ALJ's decision. Dr. Oms reported significant limitations in Vélez's activities of daily living, isolation tendencies, delayed thought process, deficiencies in memory, and impaired attention. She was partially oriented, and could easily decompensate. Tr. 27, Exh. 10F at Tr. 512-516.

**Ponce Health Sciences University**

At the initial psychiatric evaluation on September 1, 2015, Vélez reported a history of depressed mood, with high levels of anxiety, loss of energy and interest in daily activities, poor sleep, and poor concentration. Stressors included family problems and her father's suicide eleven years prior. She denied manic symptoms, or having suicidal or homicidal ideas. Exh. 34F at Tr. 692-694.

The legible parts of the progress notes from October 22, 2015 show that Vélez exhibited depressive symptoms such as anxiety, irritability, anger, crying spells. She denied psychotic, suicidal, or homicidal symptoms. Check-marked in a mental status list were that she appeared well-groomed, made adequate eye contact, and was cooperative and calm. She was alert and

oriented in time, space, and person. Her mood was depressed, anxious, and frustrated. Her affect was sad, tearful, and frustrated. Her intellectual functioning was adequate. Her thought process was coherent, logical, and circumstantial. She showed no memory impairment. She had good insight (acknowledged her problems), had sound judgment, and adequate impulse control. Vélez was provided with psychotherapy and prescribed medication to target her depressive symptoms. Exh. 34F at Tr. 686-69.

*Procedural History*

Vélez filed a function report and a pain description questionnaire, both dated May 27, 2013, claiming that she had constant pain on her lower back, which worsened with movement. The pain was worse in the morning. Her conditions limited her ability to work because she could not bend, stand, or sit for too long, or exert strength. She had difficulty walking and lost balance easily. Her legs hurt. Emotionally, she felt nervous, uneasy, and anxious. She would get depressed, had nightmares and insomnia, cried a lot, forgot things easily, and could not concentrate. She spent all her time at the house and did not want to go out. She would listen to the radio and watch television. She needed help going to the bathroom and to get dressed because she could not bend. She did not need to be reminded to take care of her personal needs and grooming, but did need to be reminded of her medications. She did not cook, do house chores or yard work, or drive, because she could not bend or stand for too long, and her legs would go numb. She could ride in a car. She has lost interest in the activities she used to enjoy, such as going to the beach. She did not socialize and preferred to be alone, but needed someone to accompany her when she went out because she forgot things. She got along well with family, friends, neighbors, and authority figures. Exh. 3E at Tr. 92-93, 426-427; Exh. 4E at Tr. 94-102, 428-435.

Vélez check-marked that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, understand, follow instructions, and use her hands. She could walk for five minutes before needing to stop and rest. She had to rest twenty minutes before resuming walking. She could not finish what she started. Tr. 99, 433.

Vélez was referred to Dr. Reinaldo Carreras by the Disability Determination Unit for a neurological consultative evaluation. Dr. Carreras reported on June 19, 2013 that Vélez had bilateral lumbosacral radicular pain associated with neurogenic claudication of the legs, probably due to bulging disc and degenerative disc disease at L4 L5 and L5 S1 with spinal canal stenosis;

bilateral mild carpal tunnel syndrome; postural cervicodorsal strain; left knee arthralgias; and a psychiatric disorder (anxiety and major depression) by history. Exh. 3F at Tr. 495-497.

On neurological examination, her gait was slow and antalgic. She limped, favoring the left leg. She was unable to walk on heels and toes. As to her motor system, she showed a diffuse antalgic weakness of both lower limbs due to pain in the back and thighs. Lower extremities strength was a four out of five. As to her sensory system, she presented hypoesthesia to pin prick on the left L5 S1 dermatomes. Tr. 495-496, 500.

On musculoskeletal exam, she showed positive Phalen Sign on both hands but no joint pain, tenderness, or swelling. On her head and neck, there was mild tenderness to palpation of the lower nuchal, scalenus, and trapezius muscles. Palpation was painful from the L3 to L5 spinous processes, and there was bilateral lumbar paravertebral muscle spasm and tenderness. Palpation at the bilateral sciatic notch, thigh, and calf was very painful. The straight leg raise test was positive at 75 degrees on both sides. Her range of motion of the back, neck, and knee were affected. Left knee x-rays showed minimal narrowing of the medial compartment of the tibiofemoral joint space. Tr. 496, 499, 501-503.

As to her mental status, she was alert and oriented in time, place, and person. Her speech, memory, and judgment were normal. Her mood was depressed, her affect was anxious, and she showed psychomotor retardation. Tr. 495.

Dr. Carreras assessed that Vélez's ability to lift, carry, stoop, stand, walk, and sit were markedly impaired, and her ability to handle objects and travel were partially impaired. Prognosis was poor for improvement in view of the chronicity and marked psychiatric overlay. Tr. 497. Also, she needed to use a cane or walker. Tr. 500. As to her hand function, Vélez had full strength (five out of five) on both hands, and was able to grip, grasp, pinch, finger tap, oppose fingers, button a shirt, and pick up a coin with both hands. Tr. 501.

The case was also referred to Dr. Luis A. Toro for a psychiatric consultative examination. Dr. Toro found Vélez to be anxious and moderately depressed. Her speech was coherent and relevant. She showed no unusual behavior, or suicidal or homicidal ideas. She cried when talking about her father's death and her back condition. She was oriented in place, person, and time. Her memory was good for recent, immediate, and remote events. Her attention, concentration, and retention were slightly diminished, but her judgment and reasoning were not impaired. She had good insight into her condition. She could maintain normal interpersonal relationships and handle

funds. Her Global Assessment of Functioning ("GAF") was 55 (moderate symptoms). Dr. Toro diagnosed major depression, recurrent, with a guarded prognosis. Exh. 4F at Tr. 504-506.

Two non-examining State Agency physicians, Dr. Adalisse Borges and Dr. Pedro Nieves, offered their RFC assessments at the initial level based on the record evidence.

On July 10, 2013, Dr. Borges, psychologist, assessed that Vélez had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. She was moderately limited in her ability to maintain attention and concentration for extended periods. Dr. Borges concluded that "the available evidence reports a moderate condition and the abilities for simple and detailed tasks." Exh. 1A at Tr. 267-272.

On July 17, 2013, Dr. Nieves, internist, assessed that Vélez could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk with normal breaks for a total of four hours, sit with normal breaks for a total of about six hours in an eight-hour workday, and push and/or pull unlimitedly. As to postural limitations, Vélez could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, and occasionally kneel, crouch, and crawl. She had no manipulative, visual, communicative, or environmental limitations. Vélez was limited to a narrow range of light work, but not limited to unskilled work. Exh. 1A at Tr. 269-273.

On July 19, 2013, her claim was denied. Tr. 14, 81, 275, 292. Vélez requested reconsideration, alleging worsening of her conditions. New evidence was submitted. Tr. 283, 296. She filed disability reports on appeal, dated August 26, 2013 and June 5, 2014, in which she does not claim changes in her conditions or new conditions. Exh. 6E at Tr. 438, Exh. 9E at Tr. 454. In a function report dated February 22, 2014, she reasserted her same claims of how her conditions limited her ability to work as in the first function report, but in the check-marks added memory and concentration to her list of affected abilities. Exh. 7E at Tr. 106-114, 444-451.

On May 6, 2014, Dr. Brenda Concepción revised the new medical evidence and Vélez's claim of worsened physical conditions, and concluded that the notes after the initial determination did not support a worsening of her conditions, and that the prior determination at the initial level was "substantively and technically correct." The original determination by Dr. Nieves was affirmed as written. Exh. 3A at Tr. 282-283, 537.  Dr. Jesús Soto assessed that Vélez had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes

of decompensation, each of extended duration. Dr. Soto also concluded that the record showed that Vélez had a moderate condition, and the ability to perform simple and detailed tasks. Exh. 3A at Tr. 283-284, 288.

The initial non-disability findings were affirmed on May 8, 2014. Tr. 85, 291, 297. Vélez requested a hearing before an ALJ. Tr. 300. Upon being advised that the hearing could be held by VTC (Tr.316), Vélez timely filed on October 22, 2014 her objection, stating "I want my hearing to really be a full fair one. Although it may be burdensome for you to travel to Mayagüez or Ponce, I am more than willing to do some travel in order to obtain an in-person hearing." Exh. 10B at Tr. 321. Vélez later filed on July 13, 2016 (signed July 5, 2016) and on September 13, 2016 "Acknowledge Notice of Hearing" forms, indicating that she would appear at the time and place indicated in the notice of hearing she received. Exh. 11B at Tr. 322-357, Exh. 12B at Tr. 88, 358; Exh. 16B at Tr. 378..

A hearing before ALJ Raúl Canela Pardo was held on July 20 and continued on October 14, 2016 by VTC after Vélez showed cause for her failure to appear at the first hearing. Tr. 369, 377.

I note that for the July 20 hearing, the transcript says that the hearing was held in Ponce, Puerto Rico. There is no mention of VTC. Tr. 71, 73. That day, vocation expert ("VE") Tania Shullo (résumé at Tr. 478-479) testified that Vélez's job as a heavy equipment operator was a medium physical capacity, skilled position with a Specific Vocational Preparation ("SVP") of 6. For the first hypothetical, the ALJ asked if a person limited to light work who could occasionally climb stairs, never climb hand ladders, and occasionally crouch; and with a mental limitation of simple and routine work, and that could respond appropriately to the public occasionally and take normal breaks as stated by the employer, could work. The VE answered that such a person could not perform past work but could work as a sorter and a mail clerk (unskilled light work with a SVP of 2). The ALJ then asked if such a person could work if she needed more breaks than normal and allowed by the employer, which resulted in a minimum of two absences a month. The VE answered that such a person could not work. Tr. 77-79.

On October 14, Vélez appeared in Ponce, Puerto Rico, and the ALJ presided over the hearing from Albuquerque, New Mexico. Also present were Vélez's legal counsel, Attorney Fabio Román, and a VE, Pedro Román (Tr. 481-482). Tr. 14, 45-80.

Vélez testified that she was a trucker for over fourteen years and stopped working because she fell several times at work and injured her neck and lower back. She also suffered from knee dysplasia after one of the falls. She could no longer work because heavy truck driving required all her physical effort and it was difficult for her to climb, clutch while steering, and unload materials like concrete blocks, concrete bags, and asphalt. She was in constant pain, and her pain dizzied her. She could sit for ten minutes, stand for five to ten minutes, and walk less than half a block before her hands and legs would go numb. She could lift a half-gallon of milk.[4] Her medications were strong but didn't help much. The Tramadol decreased the intensity of her pain some but made her sleepy. She was being evaluated to get blockages, was making arrangements for a cane for walking assistance, and was losing weight for her obesity. If the blockages didn't work, she might need surgery. She also had a hereditary condition of bad circulation for which she had to take anticoagulants for life, menstrual problems, cancerous tumors that had been scraped, and suffered from osteoporosis and degenerative osteoarthritis.

Additionally, she was seeing a psychologist for depression. She felt impotent and a failure, not being able to be as independent as before, and felt like a burden to her husband. She used to love her job, and now could barely make oatmeal for her children. She gained weight (from 195 pounds when she worked to 280 pounds when she got depressed), cried all the time, and had nightmares and anxiety attacks.

As to daily living, her mother and mother-in-law did the household chores. Her husband helped her shower and dress. She no longer drove. She couldn't partake of activities because of her pain medications. Tr. 48-63.

The VE testified that Vélez's previous work was heavy equipment driver (medium work with an SVP of 6), dump truck operator (medium work with an SVP of 2), and heavy truck driver (medium work with an SVP of 4). The ALJ asked whether a person limited to sedentary and unskilled work, but that could climb stairs occasionally but never climb ladders, crouch occasionally, occasionally answer to the public because of anxiety, and accommodate rest periods by normal breaks, could perform previous work. The VE answered that such a person could not because previous work was medium but could work as assembler and finisher,[5] both sedentary with an SVP 2. The ALJ added frequent use of both hands, to which the VE answered that such a

---

[4] The ALJ stated at the hearing that a gallon of milk weighs about eight pounds. Tr. 54.
[5] The ALJ asked for only two jobs that such a person could perform. Tr. 66.

person could perform those jobs. The ALJ then asked as a second hypothetical if such a person would work if additionally she missed work a minimum of twice a month because of physical conditions and pain, as well as mental limitations. The VE answered that such a person could not perform past work or any other work because unskilled jobs are governed by established breaks, and additional breaks or absences other than the ones stipulated by the social security ruling and the employers could mean that such a person could not keep their job. Counsel asked if Vélez could perform sedentary work taking into account her complaints about the use of her hands, and the VE answered that sedentary jobs require constant to frequent bilateral hand use, and therefore she would not be able to perform sedentary work. Tr. 63-69.

On October 27, 2016, the ALJ found that Vélez was not disabled under sections 216(i) and 223(d) of the Act from her alleged onset date of June 19, 2013 through the date last insured. Tr. 8-36. The ALJ sequentially found that Algarín:

(1) had not engaged in substantial gainful activity since her alleged onset date through her date last insured (Tr. 16);

(2) had severe impairments: lumbar and cervical degenerative discogenic disease, lumbar radiculopathy, obesity, osteoarthritis, and a major depressive disorder (Tr. 17);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 19);

(4) could not perform past relevant work but retained the RFC to perform sedentary work, except she could occasionally climb stairs, stoop, and crouch. She could never climb ladders. She was also limited to performing unskilled work involving simple tasks only, with normal breaks, and occasionally interact with the public (Tr. 22, 28); and

(5) as per her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Vélez could perform, such as assembler and finisher, both unskilled sedentary occupations with an SVP of 2. Tr. 29-30.

The ALJ noted that "[o]n October 22, 2014, the claimant objected to a video teleconference hearing alleging it was burdensome to travel from Mayaguez, PR to Ponce, PR. (Ex. 10B). Nevertheless, the claimant submitted Acknowledgement of Hearing Appearance and no further objections were subsequently raised (Exs. 12B and 16B). I will consider the subsequent

Acknowledgment of Hearing Appearance as an expressed waiver of her initial objection to a video teleconference hearing." Tr. 14.

The ALJ also noted that the record revealed that Vélez, in addition to her severe impairments, also had a medical history of non-severe impairments: migraine headaches, superficial varicose veins, lymphaedema, bilateral carpal tunnel syndrome, and bilateral early arthritis of the knees.

The ALJ found that as to Vélez's pain allegations, she consistently complained of how her pain limited her daily activities, and the record showed that her pain symptoms persisted despite ongoing treatment. Tr. 23.

The ALJ gave little weight to Dr. Oms's report because it was inconsistent with his progress notes. Tr. 27.

The ALJ gave partial weight to the State Agency physical consultants, Dr. Nieves and Dr. Concepción, and great weight to Dr. Carreras's opinion because Dr. Carreras's findings were representative of the extent of Vélez's limitations considering the longitudinal analysis of the evidence. Dr. Carreras opined that Vélez had greater restrictions than those assessed by Dr. Nieves and Dr. Concepción, and thus found that Vélez was limited to sedentary and not light work. Tr. 24-24.

The ALJ gave great weight to Dr. Toro's opinion of moderate symptomology attenuated primarily with outpatient treatment. Treatment was sporadic when reviewing the evidence longitudinally. The ALJ gave lesser weight to Dr. Carreras's opinion that Vélez had marked psychiatric overlay because his specialty was in neurology. The ALJ gave great weight only to the portion of the state agency consultants' Dr. Borges and Dr. Soto's assessments that Vélez had moderate limitations in her ability to maintain attention and concentration for extended periods of time. The ALJ noted that these consultants did not consider Dr. Oms's treatment record. The ALJ gave little weight to the portions that Vélez had no significant limitations in social interaction, instead considering Vélez's allegations that she had no participations in any social activities, and had irritability, anxiety, and anger, and finding that she had greater social limitations. Tr. 26-27.

On November 2, 2018, the Appeals Council denied Vélez's request for review, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-7, 42, 403. The present complaint followed. Docket No. 1.

# DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process that based on Vélez's age, education, work experience, and RFC, there was work in the national economy that she could perform, thus rendering her not disabled within the meaning of the Act.

Vélez first argues that her hearing before the ALJ was held by VTC, albeit her filed objection. Vélez argues that a VTC hearing does not offer the ALJ the opportunity to properly observe the claimant in order to evaluate credibility of a claimant's statements regarding intensity, persistence and limiting effects of symptoms, as per SSR 16-3p. I note an incongruence between Vélez's objection to the VTC hearing, the transcript of the first hearing, and the ALJ's remark in the decision. Vélez commented that "I want my hearing to really be a full fair one. Although it may be burdensome for you to travel to Mayagüez or Ponce, I am more than willing to do some travel in order to obtain an in-person hearing." I am assuming that her mention of "you" refers to the ALJ. Instead, the ALJ noted in decision that Vélez objected to a VTC hearing "alleging it was burdensome to travel from Mayaguez, PR to Ponce, PR." Tr. 14. The first hearing appears to have been held in Ponce, Puerto Rico, and the second hearing by VTC.

20 C.F.R. § 404.936(a) states that the ALJ sets the time and place for any hearing, considering the circumstances set forth at § 404.936(c), such as availability of VTC equipment and efficiency of holding a VTC over an in-person hearing. "The 'place' of the hearing is the hearing office or other site(s) at which you and any other parties to the hearing are located when you make your appearance(s) before the administrative law judge by video teleconferencing, in person or … by telephone." 20 C.F.R. § 404.936(b). A claimant may object to a VTC hearing being held by timely filing in writing within thirty days after receipt of the hearing notice an objection to appear by video teleconference, and "[i]f you notify us within that time period and your residence does not change while your request for hearing is pending, we will set your hearing for a time and place at which you may make your appearance before the [ALJ] in person." *Id.* at § 404.936(d).

I note that Vélez timely filed in 2014 her objection within thirty days of receipt of the hearing date notification, requesting an in-person hearing. Upon review of the record, I also note that additional notices were sent to her, that no further objections were filed or put on the record at the hearings, and that Vélez signed an acknowledgment that she would appear at the hearing, which the ALJ "consider[ed] the subsequent Acknowledgment of Hearing Appearance as an

expressed waiver of her initial objection to a video teleconference hearing." Tr. 14. Upon requesting review by the Appeals Council, no objection was raised, either. Tr. 45-80, 316-323, 329-330, 336-337, 358, 369-377, 380-385, 389-390, 403.

Not raising a claim during the administrative process renders that claim unreviewable by the federal courts. *See Mills v. Apfel*, 244 F.3d 1, 8 (1st Cir. 2001). Alternately, the Second Circuit has also found harmless error when an initial objection is not waived, given that the hearing proceeded with no difficulties imposed to the effectiveness of counsel, and no specific prejudice was raised on appeal. *Henry v. Colvin*, 561 Fed. App'x 55, 57-58 (2nd Cir. 2014)(summary order). I therefore find that this claim is without merit.

Vélez next argues that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ erred in the weight assigned to the medical opinions, particularly the treating sources, and that the ALJ, as a lay person, did not consider all of her impairments and reached a Step Five decision without medical substantial evidence to support it. Vélez further claims that the ALJ's findings were not full and detailed.

It was the ALJ's duty to weigh all of the evidence and make certain that the ALJ's conclusion rested upon clinical examinations as well as medical opinions. *Rodríguez v. Sec'y of Health & Human Servs.*, 647 F.2d 28, 224 (1st Cir. 1981). RFC is an administrative assessment of a claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments, to be determined solely by the ALJ. 20 C.F.R. §§ 404.1520(e), 404.1527(d)(2), 404.1545(a)(1), and 404.1546; SSR 96-8p. An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id*. A claimant is responsible for providing the evidence of an impairment and its severity; the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982) (citing *Richardson v. Perales*, 402 U.S. 389 (1971)).

Also, the ALJ here obtained the testimony of a VE to determine if Vélez's limitations eroded the unskilled sedentary occupational base (Tr. 29). The ALJ is required to express a claimant's impairments in terms of work-related functions or mental activities, and a VE's

testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho v. Sec'y of Health and Human Services*, 670 F.2d 374, 375 (1st Cir. 1982). In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1).

The ALJ determined that Vélez could perform sedentary work limited to climbing stairs, stooping, and crouching occasionally and never climbing ladders, and unskilled work limited to simple tasks and occasional interaction with the general public. Sedentary work requires lifting no more than ten pounds at a time, sitting for at least six hours out of an eight-hour work day, occasional walking and standing for no more than about two hours a day, and good use of the hands and fingers for repetitive hand-finger actions. 20 C.F.R. § 404.1567(a) & (b); SSR 83-10. Sedentary work does not require that a person be seated for six unbroken hours without shifting position during an 8-hour workday. *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004). This RFC assessment was incorporated into the hypothetical question he posed to the VE.

In my review of the case transcript, I found ample evidence that Vélez reported and continuously complained of and was treated for low back pain, with radiological and electrodiagnostic studies to back it up. Treatment included prescribed medications for pain and inflammation, and even epidural injections.

There is evidence from March 2014 from Dr. Cummings that Vélez's pain partially improved by 50% according to the analog visual scale, with a decrease in neurological deficit. Dr. Santiago's record from September 2014 to July 2016 also contains evidence that Vélez consistently complained of swelling in her ankles and feet, and pain in her legs, but that Vélez ambulated freely despite her obesity and condition of her lower extremities, that there was no objective sign of limited functionality, and that she remained stable with treatment. Dr. Carreras assessed in 2013 that Vélez had full strength (five out of five) on both hands, and was able to grip, grasp, pinch, finger tap, oppose fingers, button a shirt, and pick up a coin with both hands. Vélez testified that she could carry a half-gallon of milk.

As to Vélez's mental conditions, 2015 notes indicate that her intellectual functioning was adequate. Her thought process was coherent, logical, and circumstantial. She showed no memory impairment. She had good insight (acknowledged her problems), had sound judgment, and adequate impulse control.  Vélez was provided with psychotherapy and prescribed medication to

target her depressive symptoms. Vélez reported that while she preferred being along, she got along well with family, friends, neighbors, and authority figures.

It is evident that the ALJ considered Vélez's pain complaints, and evidence from the treating, consultative, and non-examining physicians and reduced Vélez's physical functional capacity. The ALJ's decision contains a lengthy summary of the treating, examining, and consultative opinions the ALJ considered, and a specific statement of the reasoning behind the weight assigned, which I find was sufficient to give the court notice of the weight given to the medical opinions and constitutes substantial evidence supporting the ALJ's determination.

The ALJ took into account Vélez's pain allegations and daily activity limitations, which persisted despite ongoing treatment. The ALJ also considered the opinions of Dr. Carreras, Dr. Nieves, and Dr. Concepción. The ALJ noted that Dr. Carreras's progress notes reflect greater limitations than those assessed by the non-examining physicians, and the ALJ assessed a more restrictive RFC than the one proposed by them. While the State Agency medical consultants or psychological consultants "are highly qualified medical sources who are also experts in the evaluation of medical issues in disability claims under the Act" (SSR 17-2p), the ALJ can assign the weight most suited as per the evidence in the record. Equally so as to the treating physicians. The ALJ did not adopt Dr. Carreras's assessment of marked limitations, either, because evidence from Dr. Santiago indicted otherwise that Vélez could ambulate normally. And while Vélez argued that Dr. Carreras should have been allotted greater weight, I note that the treatment relationship with Dr. Santiago was more "ongoing" than the one with the consultative physician, Dr. Carreras. *See* 20 C.F.R. § 404.1527(a)(2).

Finally, as to Vélez's claim that the ALJ interpreted raw data, such argument is without merit as well. The ALJ is a lay person who is generally unqualified to interpret "raw, technical medical data." *Berrios v. Sec'y of Health & Human Servs.*, 796 F.2d 574, 576 (1st Cir. 1986). He may not substitute his "own impression of an individual's health for uncontroverted medical opinion." In other words, an ALJ needs a medical expert to translate medical evidence into functional terms. *Vega-Valentin v. Astrue*, 725 F. Supp. 264, 271 (D.P.R. 2010). *See also Carrillo Marin v. Sec'y of Health & Human Servs.*, 758 F.2d 14, 16 (1st Cir. 1985). However, an ALJ may render a common-sense judgment regarding an individual's capacities, so long as he "does not overstep the bounds of a lay person's competence and render a medical judgment." *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990). Here, the ALJ obtained RFC

assessments from medical experts and, along with other evidence in the record, made his RFC determination.

I conclude that the ALJ's RFC determination is supported by substantial evidence, and the decision is therefore affirmed.

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence. *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987)). After thoroughly and carefully reviewing the record, I find that there is substantial evidence to support the ALJ's RFC finding.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 20th day of November, 2020.

*s/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge